OREGON-WASHINGTON R. & NAV. CO. v. ROYER.

SAME v. WASSON et al.

(Circuit Court of Appeals, Ninth Circuit. January 6, 1919.)

Nos. 3203, 3204.

1. WATERS AND WATER COURSES ⬥⟞179(6)—OVERFLOW—ACTION FOR DAMAGES.
   Evidence *held* to warrant submission to jury of question whether water which injured plaintiff's lands where obstructed by defendant's railroad embankment was from a natural watercourse or merely surface water.

2. WATERS AND WATER COURSES ⬥⟞38—WHAT CONSTITUTES "WATER COURSE."
   The facts that water flowing down a channel comes from melting snow, and that there is a flow for only a few months in the spring, do not necessarily take away the character or elements of a "water course," where there is a well-defined and accustomed channel.

   [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Water Course.]

In Error to the District Court of the United States for the Southern Division of the Eastern District of Washington; Frank H. Rudkin, Judge.

Actions at law by Preston Royer and by W. J. Wasson and Mabel Wasson against the Oregon-Washington Railroad & Navigation Company. Judgments for plaintiffs, and defendant brings error. Affirmed.

A. C. Spencer and C. E. Cochran, both of Portland, Or. (James E. Fenton, of Portland, Or., of counsel), for plaintiff in error.

M. A. Langhorne, E. M. Hayden, and F. D. Metzger, all of Tacoma, Wash., and Lon Boyle, of Prosser, Wash., for defendants in error.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

HUNT, Circuit Judge. These were actions by landowners, plaintiffs below, against the railroad company, defendant below, to recover damages for injuries to property resulting, as alleged, from an overflow of the lands of the plaintiffs, caused by the construction of an embankment by the railroad company over and across an alleged water course known as Spring creek, and by placing in the alleged bed or channel of the alleged creek a pipe or drain which was insufficient to carry off the waters that flowed down through the creek at certain seasons of the year. The railroad company denied all damage, and, after trial to a jury, verdicts and judgments were in favor of plaintiffs, and the railroad company sued out writs of error. As the two cases

were tried together, and present the same legal questions, they may be conveniently considered in one opinion.

[1] The contention of the railroad company, as embodied in a request for an instruction, is that the only justifiable conclusion from the evidence is that what the plaintiff below called the channel of Spring creek is nothing more than a drain for surface water resulting from melting snow in the drainage area above the lands affected, and that, except from the waters of such melting snow, Spring creek in its channel carries no water, and is dry for 11 months of the year, and that as a legal consequence the surface water became a "common enemy," against the flowage of which the landowner was obliged to defend himself. But the District Court declined to sustain such a position, and submitted the case to the jury upon the theory that Spring creek is a natural water course, and that the railroad company was bound to construct a culvert or to make other adequate provision to permit the passage of the waters flowing down at times of all ordinary freshets, but was not bound to anticipate or provide against unprecedented or unexpected floods. To test the ruling of the court, it becomes necessary to get a clear understanding of the physical situation.

At the time of the damage to the property of the plaintiffs below, the railroad ran westerly between Walla Walla and North Yakima, Wash., over and across a part of the land of the plaintiff Wasson and north of and near the land of the plaintiff Royer.

Spring creek has its origin in the Rattlesnake Hills, some 15 or 16 miles northwest from the lands of the plaintiffs. The upper limits of the head are in sections 25, 11, and 24; the creek runs generally southeasterly at the head, and bears southwesterly for 3 or 4 miles, then southeasterly for about 2 miles into the Yakima river. The general lay of the land from where Spring creek has its origin is rolling, but the creek is in a·canyon for 14 or 15 miles, and until a short distance from the railroad right of way, where the ground spreads out flat; the point at which the creek begins to widen being about the north line of the southeast quarter of the southeast quarter of section 20. Up to that point the channel, though irregular in width and depth, is well defined, and drains 20,000 or 25,000 acres; the water coming down from various gulches into the Spring creek gulch. The bed of the creek is bridged at several places where the county roads cross it.

The resident engineer of the railroad company testified that he was well acquainted with the immediate country involved, and had prescribed the size of the culvert which was put in, and believed that a 48-inch diameter was sufficient to carry off the "normal flow of surface water that came down." He said that from the county road south of Starkey's place, which is in the southeast quarter of the southeast quarter of section 20, and in the course of Spring creek, there was a small rock dam, in addition to several other small obstructions in the channel above the Sunnyside dam, which was approximately 40 feet high; that after the water passed over the wasteway it came down in such volume "that the original channel was so small as to be unable to carry the water, and it overflowed and spread out over the land, forming two channels in Mr. Starkey's field, one marked on the map

(which was introduced in evidence) 'original channel,' and the other 'overflow channel.'" He described the water as passing on down to the next 40 below, which would be the southeast quarter of the southeast quarter of section 20, and said that "the channels came together again as a main channel, with the exception of the water spreading out to a considerable extent on the ground," that the water overflowed the greater part of the Starkey land, running entirely out of the channel, and then, as it flowed to the south line of section 20, it struck the other dam, which had been put in north of the county road, and again spread out.

The fall from the source of the creek to where it crosses the railroad right of way is something over 2,000 feet. The only outlet from the valley is under the railroad tracks. The water which is caused by snow melting in the hills only flows during the spring. The amount of snow during a season varies from nothing to 18 inches. During seasons when the snow melts gradually, and there is no frost in the ground, the water is absorbed, and there is none in the creek, and when the ground is frozen, and the snow in the hills is melted by a chinook wind, there is water in the creek.

At the point where Spring creek runs under the right of way of the railroad company there has been a fill on each side of the creek, 6 to 8 feet deep. The fill extends from the creek about 600 feet east of the county road in section 28, where it passes from an embankment to a slight cut. The drain under the railroad track and within the right of way consisted of one 48-inch corrugated metal culvert, which was about 4 feet below the top of the track. When this culvert was put in, the engineer inquired of the residents then thereabouts as to the usual flowage of water down Spring creek, and also examined the land toward the foot of the Rattlesnake Hills, and estimated the flowage to be about 20 second feet.

About January 20, 1916, there were from 12 to 16 inches of snow. There was not much snow on the level lands, except where drifted into depressions, but in the hills there was a great deal. The ground was frozen, and the snow did not melt until the chinook wind commenced on January 20th, blowing only during the daytime, and lasting until January 23d. The snow melted very rapidly, causing a sudden rush of waters, which, when they arrived at the embankment of the railroad, destroyed the roadbed for a great distance, broke through a stretch of railroad track, went over the ties, and washed a deep hole through the railroad into the lands of plaintiffs.

On January 23d there was an additional snowfall of about 15 inches, and the channel of Spring creek was practically drifted full of snow. A second chinook wind came and partly melted the snow, and the snow and water together started to flow down; the snow congealing at the railroad track and forcing the water to spread. The results of the storms were overflows caused by the railroad embankment.

We think that the court was right in holding that under the facts Spring creek was a natural water course. The water which flowed through it came from snow melting in high hills, and for several miles flowed naturally through a well-defined channel between banks, down

to the point just above plaintiffs' lands, where dams or like artificial obstructions checked the course of the waters, and thus caused them to overflow their accustomed channel and to spread out, in part, into another channel, and to overflow the lands northwest of plaintiffs' lands, only, however, to flow together again in a single main channel, before reaching the railroad culvert, and thence to flow naturally to the Yakima river.

[2] The facts that the water which went down the channel came from melting snow, and that there was a flow for but a few months in the spring, do not necessarily take away the characteristics or elements of a water course. In Reynolds v. McArthur, 27 U. S. (2 Pet.) 417, 7 L. Ed. 470, the Supreme Court recognized that a stream could acquire the name of a river in the channel of which at some seasons no water flows. In Borman v. Blackmon, 60 Or. 304, 118 Pac. 848, the court held that a stream fed by melting snows, which at regular seasons descends through long, deep gullies upon lands below, and on its onward flow carves out a distinct and well-defined channel, "which even to the casual glance bears the unmistakable impress of the frequent action of running water, and through which it has flowed from time immemorial," is a water course. Justice Burnett, for the court, in applying these elements, said:

"After the stream has dried up, we can go upon the ground and say, 'Here it flowed; here is the track of the water; in this course the stream habitually runs.' This happens on the watershed in question, not from a cloudburst, but occurs every spring from the descent of the melted snow. The water of all streams is derived, directly or indirectly, from surface water which falls, in the beginning, from the clouds; but, whenever in its journey to the sea it flows in one continuous, well-marked channel, it becomes a water course, provided this regularly recurs at every returning season."

In Jaquez Ditch Co. et al. v. Garcia et al., 17 N. M. 160, 124 Pac. 891, the court quoted with approval from Harrington v. Demaris, 46 Or. 111, 77 Pac. 603, 82 Pac. 14, 1 L. R. A. (N. S.) 756, where it was held that a stream does not cease to be a water course, and become mere surface water, because at a certain point it spreads over a level meadow several rods in width, and flows for a distance without defined banks, before flowing again in a definite channel. In that case, after a careful review of many cases, it was held that where surface water in a region of bluffs seeks outlet through a gorge or ravine during the rainy season, and by its flow takes a definite and natural channel, and has always done so from time immemorial, such accustomed channel through which the water flows has the elements of a natural water course, although the flow of the water is not continuous and the size of the stream is small.

Walker v. New Mexico & Southern Pacific R. Co., 165 U. S. 593, 17 Sup. Ct. 421, 41 L. Ed. 837, cited by plaintiff in error herein, is referred to as seeming to be in conflict with the rule applied by the court; but it is pointed out that in the Walker Case the obstruction or embankment complained of was 4 miles from the mouths of the arroyo, and that the water after leaving the arroyo, spread out and became surface or flood water.

In Kroeger v. Twin Buttes R. Co., 14 Ariz. 269, 127 Pac. 735, Ann. Cas. 1914A, 1289, it was held that, where there was surface water which passed in its natural course, not over, but by, the plaintiffs' land on either side, and where at a point beyond it was intercepted by a railroad embankment, the railroad company not having constructed culverts capable of letting the water pass through, and there was an accumulation of water, which was backed up onto plaintiffs' higher land, the railroad company became liable. The court also referred to Walker v. New Mexico & S. P. R. Co., supra, but distinguished that case from the one at hand by emphasizing the fact that the Walker Case was one where there was surface water flowing from the plaintiffs' lands onto the defendants' lands, whereas in the case for decision the water was surface water cast back from off the defendants' lands onto the plaintiffs' lands.

A like distinction is to be applied in our case, where the waters were cast from the lands of the railroad company onto the plaintiffs' lands, over which they were not accustomed to flow. Of course, the facts of each case must be carefully considered; but, as bearing more or less closely upon the present questions, we cite Cairo, V. & C. R. Co. v. Brevoort (C. C.) 62 Fed. 129, 25 L. R. A. 527; Barnes v. Sabron, 10 Nev. 217; Quinn v. C., M. & St. P. R. Co., 23 S. D. 126, 120 N. W. 884, 22 L. R. A. (N. S.) 789; Kinney on Irrigation and Water Rights, § 207; Weil on Water Rights, pp. 354, 355; Rohsnagel v. N. P. R. Co., 69 Wash. 243, 124 Pac. 900; Noyes v. Cosselman, 29 Wash. 635, 70 Pac. 61, 92 Am. St. Rep. 937; Dahlgren v. C., M. & St. P. R. Co., 85 Wash. 395, 148 Pac. 567.

In Bouthuis v. Great Northern R. Co., 89 Wash. 442, 154 Pac. 789, cited by the plaintiff in error, the facts were very different from those with which we have to deal herein. The court there decided nothing more than that recovery for obstructing a stream by negligently allowing débris to flow down and to dam the creek at a point opposite the intake, and overflowing the lands of plaintiff, could not be had, where the plaintiff's evidence as to the accumulation of the dam was exceedingly vague. The legal rule that the company had a primary right to hurry the outflow of surface waters from its own property was held applicable.

Trigg v. Timmerman, 90 Wash. 678, 156 Pac. 846, L. R. A. 1916F, 424, also relied upon by plaintiff in error, is to be distinguished, in that there the court decided that an upper proprietor could by means of drainage ditches conduct and hasten the flow of surface waters naturally draining into a gully, provided it did not increase the quantity of water naturally reaching the lands of a lower proprietor. The facts, however, were so unlike those now before us, that the case cannot be regarded as fixing a rule to govern the present case.

It is further contended by the plaintiff in error that evidence shows the railroad culvert was sufficient to pass the usual amount of water resulting from melting snow, and that therefore there would be no liability for damages to property because of the culvert being insufficient to carry off the waters of an extraordinary and unexpected flood. The evidence, however, did not warrant such a conclusion, and the court

expressly charged that the first question for the consideration of the jury was whether the railroad company made adequate provision for the free passage of all water which might ordinarily be expected to flow through the water course in question. This instruction, when considered with the one to which we have already referred, wherein the court charged that the railroad company was not bound to anticipate or provide against unprecedented or unexpected floods, made the law plain in respect to the obligation of the railroad company.

It is said that the complaints in these actions were drawn upon the theory that the injury sustained by the plaintiffs below was the result of an overflow of surface waters. We are clearly of the opinion, however, that under the allegations of the complaint that Spring creek is a natural water course, with a natural channel, wherein the waters flow in their accustomed way, plaintiffs were entitled to litigate the questions of the right of the railroad company to collect water behind its embankment and to discharge it in a concentrated body upon the lands of the defendants in error.

Other points are of minor importance. They have been considered, but are not well founded.

The judgments are affirmed.